# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 11-1921

COMMITTEE OF CONCERNED
MIDWEST FLIGHT ATTENDANTS
FOR FAIR AND EQUITABLE
SENIORITY INTEGRATION, *et al.*,

*Plaintiffs-Appellants*,

*v.*

INTERNATIONAL BROTHERHOOD OF
TEAMSTERS AIRLINE DIVISION and
TEAMSTERS LOCAL 135,

*Defendants-Appellees*.

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 10-C-379—**Rudolph T. Randa**, *Judge*.

ARGUED SEPTEMBER 30, 2011—DECIDED NOVEMBER 30, 2011

Before EASTERBROOK, *Chief Judge*, and POSNER and
WILLIAMS, *Circuit Judges*.

EASTERBROOK, *Chief Judge*. The McCaskill–Bond Amend-
ment to the Federal Aviation Act, 49 U.S.C. §42112 note,

provides that a transaction "for the combination of multiple air carriers into a single air carrier" requires the combined business to merge the seniority lists of the two carriers' employees. Republic Airways Holding acquired Midwest Airlines in July 2009 by purchasing its parent, Midwest Air Group. The seniority lists for mechanics, baggage handlers, and administrative personnel have been integrated under the Amendment. But Republic furloughed the flight attendants, requiring them to apply for "new" jobs; if they are rehired, the Teamsters Union, which represents the flight attendants at Republic's older carriers (Republic Airlines, Chautauqua Airlines, and Shuttle America), places them at the bottom of its seniority roster. (Pilots, too, were furloughed, but their status is not at issue here.) The Teamsters Union has refused to budge from this position, which it has maintained even after the National Mediation Board concluded that the flight attendants who worked for Midwest became part of a single bargaining unit at an integrated air transportation business that comprised Republic, Chautauqua, Shuttle America, and Midwest. *In re Chautauqua Airlines / Shuttle America / Republic Airlines / Midwest Airlines / Frontier Airlines / Lynx Aviation*, 37 N.M.B. 148 (2010). Three of Midwest's flight attendants, and a committee purporting to speak for all of them, filed this suit.

When Republic Airways Holding acquired it, Midwest was losing money and needed to surrender most of its planes, which had been leased. Midwest had only nine planes on the date of the merger. Within a few months, Republic returned them to Boeing and abandoned the

certificate from federal regulators that entitled Midwest to engage in the air transportation business. Republic retained and used Midwest's gates, takeoff and landing slots, trademarks, code (YX), and other assets. Republic (operating with Midwest's name and marks) provided service to most of the city pairs that Midwest had flown; only the type of aircraft changed. (Midwest used Boeing 717 planes; Republic uses Embraer 190s.) Frontier Airlines, another subsidiary of Republic Airways Holding, has taken over the routes that Republic Airlines operated in Midwest's name from mid-2009 through mid-2011, and Midwest's trademarks have been retired; no one contends that these developments affect how seniority issues should have been handled earlier. (Eventually we may need to consider questions about what rights Midwest's former employees have in Frontier's seniority system, which is separate from Republic's. See *Teamsters Union, Airline Division v. Frontier Airlines, Inc.*, 708 F. Supp. 2d 750 (E.D. Wis. 2010); *In re Chautauqua Airlines*, 37 N.M.B. at 167.)

The district court held that Republic's abandonment of Midwest's certificate, and the return of its planes, meant that Republic had acquired some assets related to air transportation but not an "air carrier" for the purpose of the McCaskill–Bond Amendment. Although the court initially denied the Teamsters' motion for summary judgment, 742 F. Supp. 2d 1035 (E.D. Wis. 2010), it granted a motion for reconsideration and ruled in the Union's favor. 2011 U.S. Dist. LEXIS 2718 (E.D. Wis. Jan. 10, 2011). The court stated that "McCaskill–Bond was never meant to protect the employees of an air carrier that simply goes out of business." *Id*. at *9.

Legislatures do not mean things in the abstract; as Justice Holmes once put it, the right question is what they meant by what they said. "[A statute] does not disclose one meaning conclusively according to the laws of language. Thereupon we ask, not what this man meant, but what those words would mean in the mouth of a normal speaker of English, using them in the circumstances in which they were used . . . . But the normal speaker of English is merely a special variety, a literary form, so to speak, of our old friend the prudent man. He is external to the particular writer, and a reference to him as a criterion is simply another instance of the externality of the law. . . . We do not inquire what the legislature meant; we ask only what the statute means." Oliver Wendell Holmes, Jr., *The Theory of Legal Interpretation*, 12 Harv. L. Rev. 417, 417–19 (1899), reprinted in his *Collected Legal Papers* 204, 207 (1920). What the McCaskill–Bond Amendment means is not hard to discern.

Here is all of the statutory text that matters:

(a) With respect to any covered transaction involving two or more covered air carriers that results in the combination of crafts or classes that are subject to the Railway Labor Act (45 U.S.C. 151 et seq.), sections 3 and 13 of the labor protective provisions imposed by the Civil Aeronautics Board in the Allegheny-Mohawk merger (as published at 59 C.A.B. 45) shall apply to the integration of covered employees of the covered air carriers; [two exceptions are omitted as irrelevant]

(b) In this section, the following definitions apply:

(1) The term "air carrier" means an air carrier that holds a certificate issued under chapter 411 of title 49, United States Code.

(2) The term "covered air carrier" means an air carrier that is involved in a covered transaction. . . .

(4) The term "covered transaction" means—

(A) a transaction for the combination of multiple air carriers into a single air carrier; and which

(B) involves the transfer of ownership or control of—

(i) 50 percent or more of the equity securities (as defined in section 101 of title 11, United States Code) of an air carrier; or

(ii) 50 percent or more (by value) of the assets of the air carrier.

Subsection (a) provides the basic rule: merging the seniority lists, rather than putting employees of the acquired carrier at the bottom of the acquiring carrier's list, was a condition of the Allegheny–Mohawk merger and therefore is required in every covered transaction "involving" covered air carriers. An "air carrier" is any firm that holds a certificate issued under 49 U.S.C. §411. Midwest held such a certificate on the date the merger closed and therefore was an "air carrier." It also was "involved in" a transaction. True, Midwest Airlines was

a subsidiary in a holding company structure. Republic Airlines' parent company acquired Midwest's parent. Yet subsidiaries are "involved in" such a transaction; the McCaskill–Bond Amendment does not require that the operating company be acquired, only that it be "involved." (Otherwise the statute could be evaded with ease, because it is easy to create a parent for any corporation.)

Thus the question becomes whether Midwest and Republic engaged in a "covered transaction." The conditions of subparagraph (B) are satisfied because Republic acquired 100% of Midwest. (It is therefore unnecessary to consider whether the gates and landing slots were worth more than Midwest's meager equity in the leased planes.) And subparagraph (A) is satisfied if Midwest became part of a "single air carrier" with Republic. That it did. Operations and schedules were integrated; Republic answered the phones, took reservations, and began to fly Midwest's routes with planes and employees that came from its other subsidiary carriers. That's why the National Mediation Board concluded that all flight attendants are part of a single pool, represented by a single union; that's why the seniority lists of the reservations clerks and mechanics already have been integrated. When Republic abandoned Midwest's certificate and returned the leased planes, this meant even more complete consolidation. Only Republic remained, as a "single air carrier."

Nothing in the text of the statute asks whether one of the merging carriers is bankrupt and about to vanish when

the transaction closes. There's a good reason for the omission: this statute grew out of American Airlines' acquisition of Trans World Airlines, which was bankrupt and would have closed its doors had it not been acquired. TWA had its main hub in St. Louis; the two Senators whose names are on the legislation represented the State of Missouri. (The original sponsors were Senators Bond and Talent; Sen. McCaskill replaced Sen. Talent as a sponsor when she succeeded him.) What seniority TWA's former employees would retain was a contentious issue that threatened to frustrate the transaction or precipitate a strike; the statute provides how these transactions must be handled in the future. One cannot remove bankrupt and soon-to-disappear carriers from the statute's coverage, as the Teamsters propose, without simultaneously circumventing the statutory text and frustrating the design behind it. "[W]hat those words would mean in the mouth of a normal speaker of English, using them in the circumstances in which they were used" is that they govern all transactions in which an acquisition is followed by joint operations, whether or not one carrier was on the brink of collapse. Republic acquired Midwest—what little of it remained— lock, stock, and barrel, via a merger, which turns two corporations into one, while the statute would have been satisfied with the acquisition of only 50% of Midwest's assets.

The statutory requirement that the (formerly) separate carriers operate as a single carrier matters when the carriers maintain separate businesses. Although United Airlines and Continental Airlines have merged (rather,

their holding companies have merged), they have continued to operate as separate businesses, integrating their operations only slowly. Until the joint operations have reached the point that they have become a "single air carrier," they need not merge their seniority lists. Midwest, by contrast, integrated operations with Republic, Chautauqua, and Shuttle America expeditiously; that's why it was able to give up its certificate and planes, while transferring gates and landing slots for use by the other jointly operated carriers. Midwest and Republic engaged in a "covered transaction." The later wasting away of Midwest illustrates the completeness of the integration; it does not negate the statute's coverage.

The judgment is reversed, and the case is remanded for proceedings consistent with this opinion.